UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 10-60995-CIV-MORENO

PALM BEACH INTERNATIONAL, INC., a
Florida Corp. and AABHASH PRADHAN,
individually,

    Appellants,

vs.

SONYA L. SALKIN, ,

    Appellee.

_____/



CLOSED CIVIL CASE

## ORDER AFFIRMING FINAL JUDGMENT OF BANKRUPTCY COURT

This appeal arises from the Bankruptcy Court's entry of final judgment in favor of Appellee Sonya L. Salkin, the Trustee in bankruptcy for Maxko Petroleum, LLC ("Maxko" or the "Debtor"), and against Appellants Palm Beach International ("PBI") and Aabhash Pradhan for breach of contract. The Debtor had filed for bankruptcy on April 16, 2008. *In re Maxko Petroleum, LLC*, Case No. 08-14652-BKC-JKO (the "bankruptcy case"). Salkin then sued PBI, the high bidder, and Pradhan–the president, owner, and guarantor of PBI's performance obligations–in an adversary proceeding to recover damages for their failure to perform and close on their bid for the Debtor's gas station property which was auctioned at a court-ordered auction sale on September 16, 2008. *See Salkin v. Palm Beach Int'l*, Adversary No. 08-01833-JKO (the "PBI adversary case"). Salkin also sued Henri Hage, the backup bidder, in a separate adversary proceeding. *See Salkin v. Hage*, Adversary No. 08-01862-JKO (the "Hage adversary case"). The Bankruptcy Court consolidated the two cases, and on October 7 and 8, 2009 a consolidated trial was held. The Bankruptcy Court entered

its Findings of Fact and Conclusions of Law on March 12, 2010, finding that Salkin was entitled to final judgment against PBI and Pradhan. *See* Findings of Fact and Conclusions of Law, ECF No. 99. On April 6, 2010 the Bankruptcy Court entered final judgment awarding damages in favor of Salkin and against PBI and Pradhan, jointly and severally, in the aggregate amount of $1,369,422.70. *See* Second Am. Final J., ECF No. 121 (the "Final Judgment"). Appellants seek the reversal of the Final Judgment in its entirety as well as the Findings of Fact and Conclusions of Law. For the reasons stated below, however, this Court finds no error in the Bankruptcy Court's Findings of Fact and Conclusions of Law and affirms that court's entry of final judgment in favor of Appellee and against Appellants.

## I. Background

Maxko, the Debtor, was a Florida limited liability company owned by Theodora Maxakoulis and directed by her son, William ("Bill") Maxakoulis. Prior to filing bankruptcy, the Debtor was the owner of real property, improvements, and fixtures thereon in Sunrise, Florida. On this property was operated a Chevron gas station, convenience store, and pizza restaurant. The gas station was operated by Sunrise Chevron, Inc, which was owned by members of the Maxakoulis family, including Bill Maxakoulis. This division of operation and ownership is standard practice in the industry and was well known to Pradhan, who owned six to eight gas stations at the time of the auction. Moreover, several pleadings in the bankruptcy case demonstrate that the existence and role of Sunrise Chevron was clearly noted for the Bankruptcy Court as well as any interested parties. *See* Final Order Granting Mot. to Use Cash Collateral ¶ 16, June 9, 2008, ECF No. 29 ("Final Cash Collateral Order"); Mot. for Order Establishing Bidding Procedures ¶¶ 5, 6, 12, July 31, 2008, ECF No. 39. In any event, it was agreed and ordered at the inception of the bankruptcy case that the income and

operations of both the Debtor and Sunrise Chevron would be treated as one. *See* Final Cash Collateral Order at 4.

After a court hearing, the Bankruptcy Court entered an order on August 15, 2008 establishing the bidding procedures for the auction sale of the Debtor's property, approving the form of the Purchase Contract, and scheduling the auction for September 16, 2008. *See* Order Granting Mot. to Establish Procedures, ECF No. 49. The Debtor subsequently obtained court authority to retain the auction company, GoIndustry Dovebid, to conduct the auction. In advertising for the auction, GoIndustry sent out a flyer identifying the property being sold as a "Modern Convenience Store, Gas Station and Car Wash on 2.20 +/- Acres". The flyer further provided:

> The property is being sold in an "AS IS" condition with no warranties, guarantees or representations of any kind. Information in this brochure has been obtained from sources believed to be accurate but is not guaranteed. Your complete inspection of the property and substantiating documents is advised.

Pradhan testified that he first became aware of the auction sale in late August, 2008 after receiving a copy of this flyer.

GoIndustry also advertised the auction sale on its website, which included, among other things, a "Property Information Package." The executive summary of the Property Information Package specifically identified the property being sold as a "4800+/- sq. ft. convenience store, five pump islands with 3836+/- sq. ft. fuel island canopy and 800+/- sq. ft. car wash." The Property Information Package also contained a disclaimer, titled "NOTICE TO ALL BIDDERS," which stated, *inter alia*, that the property was being auctioned in an "AS IS," "WHERE IS" condition and that neither GoIndustry nor the Seller or their respective agents make any express or implied warranties of any kind.

The auction sale of the gas station was conducted at the station site on the morning of September 16, 2008. Upon registering, which included depositing a $100,000 check making them eligible to bid, each of the eight or nine bidders was provided with a copy of the Property Information Package. Following a few preliminary comments, the auctioneer announced: "Now folks, we are selling real estate here today. The building and the land. We are not selling inventory, we are not selling stocks, we are not selling gas. You are not buying those three items; you are not buying inventory, stock, and gas. . . . Some of the fixtures may be leased. You are buying the fixtures in the building, the counters and the racks if they're owned by the gas station." The auctioneer then read the Notice to all Bidders from the Property Information Package in its entirety.

At the end of the bidding process, after Pradhan and Hage had engaged in a self-described "bidding war" with each other, PBI stood as the high bidder with a bid of $4.2 million, which, with a 10% buyer's premium, constituted an effective purchase offer of $4,620,000. Hage followed as the backup bidder with an effective purchase offer of $4,565,000. At the conclusion of the auction, both Pradhan and Hage executed a Bid Acknowledgment form as well as their respective purchase contracts. The Purchase Contract provided, *inter alia*, as follows:

> . . . SELLER agrees to sell and PURCHASER agrees to buy the property and the improvements thereon . . . and as more particularly described by an accurate survey and description, together with whatever personal property, furniture, fixtures and equipment so located and related to the operation of the business, (and specifically excluding any personal property, furniture, fixtures and equipment that may be the legal property of tenants) hereinafter referred to as PROPERTY . . . .

The Purchase Contract further provided:

> DAMAGES FOR PURCHASER'S BREACH. In the event of default by PURCHASER in the consummation of the purchase of

> PROPERTY in accordance with the terms of this CONTRACT, the deposit and interest accrued theron shall be forfeited to SELLER. In addition, SELLER reserves the right to pursue any and all legal remedies at law or equity including the right to maintain an action for specific performance or to have PROPERTY resold at the risk and expense of PURCHASER.

Pradhan testified at trial that, shortly after he executed the Purchase Contract, he was approached by Bill Maxakoulis, who identified himself as the property owner and stated that Sunrise Chevron, a related company, owned everything at the gas station other than the four walls. According to Pradhan, Maxakoulis also stated that Sunrise Chevron had an operating agreement which allowed it to remain at the station after any sale. PBI and Pradhan claim that these disclosures caused them to realize that they had been misled at the auction into thinking they were purchasing all real and personal property located at the station site, other than the inventory and stock located in the convenience store, and were getting a turnkey gas station operation. As a result, following this meeting with Maxakoulis, Pradhan made the decision not to post the additional required deposit and thus default under the Purchase Contract. Hage, the backup bidder, defaulted as well.

As a result of the defaults by Pradhan and Hage, the Debtor moved to confirm the forfeiture of their $100,000 initial deposits which they had posted to qualify them to bid at the first auction. *See* Mot. to Confirm Forfeiture of Deposits, Sep. 30, 2008, ECF No. 63. The motion specifically referenced the above-cited provision in the Purchase Contract titled "DAMAGES FOR PURCHASER'S BREACH." The PBI Defendants neither filed a pleading in response to such motion nor appeared at the hearing on the motion. Accordingly, on November 12, 2008, the Bankruptcy Court granted the forfeiture motion as to PBI only and deemed the PBI Defendants' initial $100,000 deposit posted by the PBI Defendants as forfeited to the Debtor's estate. *See* Order

Granting Mot. to Confirm Forfeiture of Deposits, ECF No. 123.

Shortly after her appointment as Trustee, Appellee Salkin sought and received authority from the Bankruptcy Court to sell the Debtor's property at a second auction. The second court-approved auction commenced on December 8, 2008, and Hunter Chambliss submitted a high bid of $3,050,000, for a total purchase price of $3,355,000, inclusive of the 10% buyer's premium. The sale closed, resulting in the Debtor's estate receiving $1,265,000 less than it would have received had PBI closed on its high bid after the first auction. The Bankruptcy Court awarded this amount, less the $50,000 paid by Hunter Chambliss to Sunrise Chevron for equipment and furniture omitted from the second auction, in actual damages to Salkin, for a total principal award of $1,215,000. Ultimately, the Bankruptcy Court concluded that "[Appellants'] motivation in defaulting was the result of recognizing that they had bid too high. This is classic case of buyer's remorse. . . ."

## II. Discussion

This Court notes at the outset that it must affirm the Bankruptcy Court's findings of fact unless they are clearly erroneous. Conclusions of law, however, are reviewed de novo. *In re Holywell Corp.*, 913 F.2d 873, 879 (11th Cir. 1990). Each Appellant raises two main arguments; the Court will address all four in turn.

### A. PBI's claim of anticipatory repudiation

Appellant PBI's first main argument is that certain alleged statements made by Bill Maxakoulis to Pradhan constituted an anticipatory repudiation by the Debtor, thereby extinguishing Appellants' obligations under the Purchase Contract. PBI Br. at 11. Specifically, PBI asserts, consistent with Pradhan's testimony at trial, that about ten to twenty minutes after Pradhan executed the Purchase Contract, Maxakoulis approached Pradhan, identified himself as the property owner,

and advised that PBI needed to buy furniture, fixtures, and equipment–including inventory–from him because Sunrise Chevron, a related company, owned all of the furniture, fixtures, and equipment on the property. PBI further asserts that Maxakoulis told Pradhan that Sunrise Chevron had an operating agreement which allowed it to remain at the station after any sale. *Id.* at 7. It was as a result of learning these facts from Maxakoulis, PBI claims, that Pradhan decided to default under the Purchase Contract. *Id.* at 8.

Curiously, however, at a court-ordered hearing later that same day, Pradhan made no mention of these alleged statements to the Bankruptcy Court. In fact, Pradhan admitted that the bidding process "went pretty good" and that his discomfort about Maxakoulis speaking with Hage during the auction was the "only thing I didn't feel good about." *See* Findings of Fact and Conclusions of Law at 16. The Bankruptcy Court found that these events undermined the credibility of Pradhan's testimony and ultimately determined that Maxakoulis's alleged statements to Pradhan had no effect on Pradhan's decision to default under the Purchase Contract. *See id.* Accordingly, the Bankruptcy Court concluded as a matter of law that even if it believed Pradhan's testimony, the defense of anticipatory repudiation was nevertheless unavailable to Pradhan and PBI. *Id.* at 31-32. This Court finds no error in that conclusion or in any of the factual findings supporting it.

Even assuming, *arguendo*, that Maxakoulis's alleged statements caused Pradhan to default under the Purchase Contract, none of these statements could have constituted an anticipatory repudiation of the contract. In a federal bankruptcy proceeding involving breach of a court-approved contract for the sale of real estate in Florida, Florida contract law is applicable. *See In re Alchar Hardware Co.*, 764 F.2d 1530, 1533-34 (11th Cir. 1985). Under Florida law, anticipatory repudiation of a contract relieves the non-breaching party of its duty to perform under the contract

and creates an immediate cause of action against the breaching party. *Hosp. Mortg. Group v. First Prudential Dev. Corp*, 411 So. 2d 181, 182 (Fla. 1982). An anticipatory breach of the contract requires "an absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation . . . must be distinct, unequivocal, and absolute." *Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. 3d DCA 1980). Furthermore, "[i]n order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." Restatement (Second) of Contracts § 250 cmt. b (1981).

    Here, the Bankruptcy Court specifically found that:

> [W]hile Sunrise Chevron claimed ownership of everything at the station including the gas pumps, walk in refrigerators, etc., (i) it was agreed, ordered, and represented at the inception of the case that the operations of Maxko and Sunrise Chevron would be treated *as one*, (ii) the gas station pumps and canopies, walk in refrigerators and certain other fixtures at the station were property of the Debtor *irrespective* of anything Bill Maxakoulis had to say . . . and (iii) the purported operating agreement, which Maxakoulis never produced until well after the auction and whose authenticity was dubious at best could have been rejected, *as it subsequently was*, in the bankruptcy.

Findings of Fact and Conclusions of Law at 22 (emphasis added). The Court does not find any of these factual findings to be clearly erroneous. Thus, it is clear that none of the alleged statements by Maxakoulis to Pradhan, even if they caused Pradhan to default under the Purchase Contract, could have constituted an anticipatory repudiation because none of them amounted to a "distinct, unequivocal, and absolute" repudiation indicating that the Debtor, Maxko, would not or could not perform under the contract.

*B. PBI's claim that the Trustee failed to prove that the Estate suffered any cognizable actual damages*

Appellant PBI's second main argument is that the Trustee failed to prove that the Debtor's estate suffered any cognizable actual damages as a result of PBI's alleged breach of the Purchase Contract. PBI Br. at 17. Specifically, PBI contends that the principal damages awarded by the Bankruptcy Court–the difference between the sale price under Appellants' Purchase Contract and the resale price, less the $50,000 paid by Hunter Chambliss, the subsequent purchaser, to Sunrise Chevron for equipment and furniture omitted from the second auction–were inappropriate because the "scope, extent and value of what was sold" under each of the two purchase contracts was substantially different, thereby making it impossible to quantify damages based on the difference in the two sales prices. *Id.* At bottom, PBI asserts that this is a "classic case of apples and oranges." *Id.* at 22. The Bankruptcy Court considered these same arguments below, however, and found them to be without merit, ultimately rejecting PBI's contention that the two purchase contracts substantially differed. *See* Findings of Fact and Conclusions of Law at 39–40. This Court agrees, resting on the Bankruptcy Court's well-reasoned opinion. Accordingly, the Court finds that the Bankruptcy Court did not err in finding that the Trustee properly established that the Debtor's estate suffered cognizable actual damages.

### C. Pradhan's claim of unclean hands

Appellant Pradhan's first main argument is that the Trustee's conspiracy admission in the Hage adversary case conclusively established the PBI Defendants' unclean hands defense in its adversary case. Pradhan Br. at 7. Specifically, in her answer and affirmative defenses to Henri Hage's counterclaim in the Hage adversary case, the Trustee asserted the defense of unclean hands, thus admitting for purposes of the defense that Hage and Bill Maxakoulis colluded to drive up the bid at the first auction. *See* Pl.'s Answer to Countercl. and Affirm Defenses, ECF No. 16. While the

Bankruptcy Court found that this defense was not supported by the evidence, *see* Findings of Fact and Conclusions of Law at 32, Pradhan argues that the Trustee's admission that such collusion took place nevertheless constituted a binding judicial admission serving to establish the PBI Defendants' own defense of unclean hands in its adversary case, Pradhan Br. at 8. The Bankruptcy Court rejected this argument on two grounds, finding that "not only was the judicial admission . . . formally withdrawn by [the Trustee], but the operative pleading in which it was contained was not a pleading in the adversary proceeding to which [Appellants] were parties." Findings of Fact and Conclusions of Law at 33. Pradhan attacks both grounds on appeal; however, since the Court finds that the second of these grounds was a proper basis for refusing to treat the Trustee's conspiracy admission as a binding judicial admission, it need not analyze the first.

"Normally, factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983). Judicial admissions are not conclusive, however, if the court allows the party to withdraw the admission or if the underlying pleading is amended or withdrawn. *In re Summit United Serv., LLC*, No. 03-67061-WHD, 2005 WL 6488106, at *4 (Bankr. N.D. Ga. Sept. 19, 2005). The Fourth Circuit elaborated:

> Once [a judicial admission is] made, the subject matter ought not be reopened in the absence of a showing of exceptional circumstances, but a court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and the party was laboring under a mistake when he made the admission.

*New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963).

In the Hage adversary case, the Trustee did not withdraw or amend the underlying pleading

-10-

itself; rather, the Trustee withdrew without explanation only the affirmative defense of unclean hands in which the conspiracy admission was made. *See* Pl.'s Notice of Filing Withdrawal of First Affirm Defense to Countercl., ECF No. 53. Pradhan claims that "the Record evidence [establishes] that the Conspiracy Admission was not 'clearly untrue' or raised by mistake." Pradhan Br. at 12. The fact, however, that the Bankruptcy Court found no evidence of a conspiracy between Hage and Maxakoulis, or even any definitive evidence as to whether anything was said at all between the two during the auction, tends to establish just the opposite–that the conspiracy admission was indeed "clearly untrue." *See* Findings of Fact and Conclusions of Law at 12. This finding, which the Court does not find to be clearly erroneous, firmly supports the Bankruptcy Court's decision in allowing the Trustee to withdraw her admission. This Court will not second guess the judgment of the Bankruptcy Court, which had ample opportunity to consider the testimonial and documentary evidence presented at trial and was also in a much better position to assess the demeanor and credibility of witnesses on the stand. Therefore, the Court finds that the Trustee's conspiracy admission was property withdrawn and that the Bankruptcy Court did not err in refusing to treat that admission as a conclusive judicial admission.

*D. Pradhan's claim that the Trustee is limited to liquidated damages*

Pradhan's second main argument on appeal is that the Bankruptcy Court's judgment should be reversed because the Trustee is limited under the terms of the Purchase Contract to the recovery of liquidated damages and is not entitled to actual damages. Pradhan Br. at 12. Specifically, Pradhan argues that the Forfeiture of Deposits Clause[1] in the Purchase Contract should be construed as a

---

[1] The Forfeiture of Deposits Clause reads in pertinent part as follows: "In the event of default by PURCHASER . . . the deposit and interest accrued thereon shall be forfeited to SELLER."

liquidated damages provision thereby precluding the recovery of actual damages. *Id.* at 13-20. The standard of review applicable to contract interpretation is de novo. *Boswell v. Zegeye*, 954 So. 2d 66, 68 (Fla. 4th DCA 2007). A contractual provision for the forfeiture of deposits may be classified either as a valid liquidated damages provision or as an invalid penalty. *See Hyman v. Cohen*, 73 So. 2d 393, 398 (Fla. 1954); *Kanter v. Safran*, 68 So. 2d 553, 559 (Fla. 1953); *Stenor, Inc. v. Lester*, 58 So. 2d 673, 675 (Fla. 1952).

In the instant case, it is clear that the Forfeiture of Deposits Clause, when viewed in conjunction with the contractual language that follows, must be construed as a penalty. The Florida Supreme Court has held that when a contract grants the seller an option either to retain the forfeited deposit money or to sue for actual damages, the forfeiture provision becomes an unenforceable penalty. *Lefemine v. Baron*, 573 So. 2d 326, 329-30. The *Lefemine* Court reasoned:

> The reason why the forfeiture clause must fail in this case is that the option granted to [seller] either to choose liquidated damages or to sue for actual damages indicates an intent to penalize the defaulting buyer and negates the intent to liquidate damages in the event of a breach. The buyer under a liquidated damages provision with such an option is always at risk for damages greater than the liquidated sum. On the other hand, if the actual damages are less than the liquidated sum, the buyer is nevertheless obligated by the liquidated damages clause because the seller will take the deposit under that clause. Because neither party intends the stipulated sum to be the agreed-upon measure of damages, the provision cannot be a valid liquidated damages clause.

*Id.*

Here, immediately following the Forfeiture of Deposits Clause, the Purchase Contract states that, "[*i*]*n addition*, SELLER reserves the right to pursue any and all legal remedies available at law or equity including the right . . . to have PROPERTY resold at the risk and expense of

PURCHASER" (emphasis added). A plain reading of this contractual language indicates that it grants seller not merely a choice between retaining the forfeited deposit money and suing for actual damages, but the right to pursue *both* remedies–a provision even more penal in nature. *See MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1272 (11th Cir. 1999) ("[The reasoning behind *Lefemine*] applies with even greater force in cases where damages provisions allow the non-breaching party, not a choice *between* two options . . . but the right to pursue them both."); *see also Outrigger Resort Corp. v. L & E Corp.*, 611 So. 2d 1358, 1359 (Fla. 4th DCA 1993) (finding to be a "clear penalty" a damages provision that allowed seller of real estate, in the event of default by buyer, to retain the deposit money as partial compensation *and* to pursue "any remedies available at law").[2] Therefore, pursuant to *Lefemine*, the Court finds the Forfeiture of Deposits Clause in this case to be an invalid and unenforceable penalty. Accordingly, it is read out of the Purchase Contract, and the Trustee is entitled to prove actual damages. *See Lefemine*, 573 So. 2d at 330 (declaring as a penalty a default provision which granted seller the option to sue for damages or retain the deposit money and remanding the case for trial on actual damages); *see also Stenor, Inc.*, 58 So. 2d at 676 ("When the stipulated sum it [sic] held to be a penalty . . . the party seeking to recover for the breach must allege and prove his actual damages.").

Pradhan contends, however, that the Trustee, having initially embraced the validity of the Forfeiture of Deposits Clause in filing to join in the Debtor's Motion to Confirm Forfeiture of

---

[2]Pradhan cites to *In re Klemen*, 22 B.R. 757 (Bankr. N.D. Ill. 1982) in support of his argument that the Purchase Contract in this case does not provide the Trustee the option to sue for actual damages. This reliance is misplaced, however, as the contract here, unlike in *In re Klemen*, specifically authorizes seller to pursue any and all legal remedies *including* the resale of the property at purchaser's expense. Pradhan also cites to *Hillsborough Cnty. Aviation Auth. v. Cone Bros. Contracting Co.*, 285 So. 2d 619 (Fla. 2d DCA 1973), but that case is distinguishable as well because the contract there provided for both liquidated damages and actual damages but for separate breaches, whereas here the contract provides for both liquidated damages and actual damages for the same breach–a default by purchaser.

Deposits, should have been judicially estopped from subsequently arguing (in response to PBI's Motion to Dismiss and Motion for Summary Judgment) that the Forfeiture of Deposits Clause could not be enforced as a liquidated damages provision pursuant to *Lefemine*. Pradhan Br. at 20-24. The Court finds this argument to be without merit. A careful review of the Debtor's Motion to Confirm Foreiture of Deposits reveals, contrary to Pradhan's assertions, that the Debtor (and hence the Trustee by operation of law) never in fact argued that the Forfeiture of Deposits Clause constituted a valid liquidated damages provision or that the forfeited deposit money should be characterized as liquidated damages. Rather, the Trustee maintained throughout the PBI adversary case that the $100,000 forfeited deposit merely represents a portion of the actual damages suffered by the Estate as a result of Appellants' breach and that the parties never intended to fix the damages to this amount. *See* Compl., ECF No. 1; Pl.'s Resp. to Def.'s Mot. to Dismiss, ECF No. 23; Pl.'s Resp. to Defs.'s Mot. Summ. J., ECF No. 73. The fact that this Court, in its de novo interpretation of the Purchase Contract, has declared invalid the Forfeiture of Deposits Clause, does not affect the analysis, as the Trustee was entitled to prove, and has indeed proved, actual damages. Accordingly, the Court finds that the Bankruptcy Court did not abuse its discretion in declining to estop the Trustee from asserting that the Forfeiture of Deposits Clause could not be enforced as a liquidated damages provision.

Pradhan offers two final arguments in support of his claim that the Trustee is limited to the recovery of liquidated damages: (1) that the Trustee lacked standing to contest the Forfeiture of Deposits Clause on the basis that it constituted a penalty; and (2) that the Trustee is precluded from pursuing an award of actual damages pursuant to Florida's election of remedies doctrine. Pradhan Br. at 24-25. The Bankruptcy Court considered these same arguments below, however, and found

them both to be without merit. *See* Findings of Fact and Conclusions of Law at 36 n.11, 37. This Court agrees, resting on the Bankruptcy Court's well-reasoned opinion. Accordingly, the Court finds that the Bankruptcy Court did not err in finding that the Trustee was not limited to the recovery of the forfeited deposit money and may instead recover actual damages.

### III. Conclusion

Having closely reviewed the Bankruptcy Court's Findings of Fact and Conclusions of Law, and having considered the briefs and oral argument of counsel for the parties, the pertinent portions of the record on appeal, and the applicable law, this Court finds that the Bankruptcy Court's entry of final judgment in favor of Appellee and against Appellants was proper and correct as a matter of law and was based on sufficient factual findings which were not, themselves, clearly erroneous. Accordingly, it is

**ADJUDGED** that the Bankruptcy Court's Second Amended Final Judgment **(D.E. No. 121)**, entered on **April 6, 2010** in the PBI adversary case, is AFFIRMED in its entirety.

DONE AND ORDERED in Chambers at Miami, Florida, this 22nd day of December, 2010.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record